

JUL - 3 2008

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

GMAC

     Appellant,               Civil Action No. 3:07cv515

v.

MORRIS DWAYNE HORNE

     Appellee.

### MEMORANDUM OPINION

This matter is before the Court on the consolidated appeals filed in GMAC v. Morris Dwayne Horne (No. 3:07cv515; No. 3:07cv719), CitiFinancial Auto Corporation v. Amy Lillian Taylor (No. 3:07cv538; No. 3:07cv732), CitiFinancial Auto Corporation v. Robert Hyman (No. 3:08cv123), and GMAC v. Aaron LaVigne et al. (No. 3:07cv755; No. 3:08cv151). The creditors, GMAC and CitiFinancial, appeal from the decisions of the Bankruptcy Courts issued in In re Pajot, 371 B.R. 139 (Bankr. E.D. Va. 2007) ("Pajot") and In re Aaron Kyle LaVigne and Amanda Marie LaVigne ("LaVigne"), No. 07-30192, 2007 WL 3469454 (Bankr. E.D. Va. Nov. 19, 2007).

### STATEMENT OF FACTS

The appeals present issues regarding whether certain components of the respective debtors' automobile purchases fall within the reach of the respective creditors' purchase

money security interests.  The financial components at issue are:  (1) so-called "negative equity" which is the amount owed by the debtor to a third-party on trade-in vehicles (a) that exceeds the value of the trade-in vehicle, and (b) that was paid off by the seller and then included in the applicable contractual documents as part of the financed purchase price of the new vehicle; (2) extended warranty or service contracts; (3) so-called "gap" and other insurance; and (3) various registration, licensing, and titling fees. The pertinent, and undisputed, facts respecting each debtor's case are set forth below.

### 1.  Morris Dwayne Horne

On June 24, 2006, Morris Dwayne Horne, purchased a 2006 Chevrolet HHR from a Chevrolet dealer in Virginia for his personal use.  Horne traded in a 2004 Chevrolet Colorado in connection with the purchase; he owed more on the trade-in vehicle than its value (the "negative equity") which was $3,721.17.    Horne  signed  a  Retail  Installment  Sales Contract, which reflects that the purchase price included the price of the new vehicle, the negative equity, an extended service contract, gap insurance, official fees paid to government agencies, and government certificate of title fees.    After crediting the value of the trade-in vehicle, the total amount financed was $22,328.91.    The Retail

-2-

Installment Sales Contract disclosed the financing package total ($22,328.91) as the "Total Sales Price" and gave the dealer a security interest in the new vehicle in the amount of the Total Sales Price. The Dealer assigned the contract to GMAC, which perfected its security interest.

Horne filed Chapter 13 bankruptcy on November 7, 2006 within five months of purchasing the new vehicle. GMAC filed a proof of secured claim in the amount of $21,332.71, the balance owed under the Retail Installment Sales Contract. Horne proposed a Chapter 13 plan seeking to bifurcate GMAC's claim into: (1) a $15,535 secured claim equaling the retail value of the new vehicle; and (2) a $6000 unsecured claim, consisting of the amount of the negative equity, the extended warranty, the gap insurance, and the fees.

## 2. Any Taylor

Amy Taylor entered into a Retail Installment Sales Contract on March 31, 2006 for the purchase of a vehicle. (Statement of Facts at ¶ 2.) Within 910 days, Taylor filed for Chapter 13 bankruptcy. At the time the vehicle was purchased, Taylor traded in a vehicle with negative equity of $3,921.88. The total amount financed by the dealer in connection with the purchased vehicle was $20,146.18, including the negative equity value. Upon the filing of the

-3-

Chapter 13 bankruptcy, CitiFinancial, the assignee of the Retail Installment Sales Contract, filed a proof of claim for $20,732.53. (Id. at ¶ 5.) The Chapter 13 plan proposed that the negative equity value of $3,921.88 would be treated as general unsecured debt, while the remainder of the loan would be treated as secured. (Id. at ¶ 6.) According to the Retail Installment Sales Contract signed by Taylor, the dealer financed the negative equity and official fees paid to government agencies, government certificate of title fees, and a processing fee. All these amounts were included in CitiFinancial's proof of claim.

### 3. Aaron LaVigne

Aaron LaVigne entered a Retail Installment Sales contract for the purchase of a 2006 Chevrolet HHR. The dealer financed a total of $27,232.02 and assigned the loan to GMAC. The financing included the negative equity on a trade-in vehicle valued at $20,900, on which LaVigne owed $27,603.92. In addition, the creditor financed disability insurance, as well as government license and registration fees, government certificate of title fees, an extended warranty contract, gap protection, and a processing fee.[1]

---

[1] LaVigne adopted the Statements of Position and briefs filed by Debtors Horne and Taylor and did not file a separate statement of facts. (Docket No. 33.)

-4-

The case of Robert Hyman was terminated on March 3, 2008 pursuant to the filing of an Amended Transmittal Sheet of Record on Appeal. (No. 3:08cv123 at Docket No. 3) and, therefore, it is no longer a subject of these consolidated appeals.

## BANKRUPTCY COURT OPINIONS

As explained previously, the three cases on appeal are covered by two opinions (the Pajot and LaVigne opinions) issued by different judges in the Bankruptcy Court. In Pajot, the Bankruptcy Court held that the negative equity on trade-in vehicles was not part of the price of the new vehicles and was not considered purchase money debt for the purposes of the hanging paragraph. 371 B.R. at 154. Pajot also held that gap insurance coverage financed by the creditor as part of the Total Sales Price was not part of the purchase money debt, but that the financing of the extended warranty contract was covered by the purchase money security interest. Id. at 155. In LaVigne, the Bankruptcy Court held that the creditor maintained no security interest in the negative equity financing, and that creditors do not have purchase money security interests in extended warranty contracts or in any insurance policies, including disability, single interest, and gap insurance policies. 2007 WL 3469454, at *11-12. Given these holdings, the

-5-

Bankruptcy Court entered orders in the cases confirming each respective debtor's plan pursuant to which only part of the respective creditor's claim was accorded secured status.

## STANDARD OF REVIEW

The conclusions of law made by the Bankruptcy Court are reviewed de novo. See Butler v. David Shaw, Inc., 72 F.3d 437, 440 (4th Cir. 1996). The Bankruptcy Court's factual findings may not be set aside unless they are clearly erroneous. Id. at 441. According to the parties, there are no disputed factual issues, and this appeal presents only questions of law.

## DISCUSSION

The issues presented by these consolidated appeals turn on application of a paragraph in a newly-enacted section of the Bankruptcy Code and on the meaning of the Uniform Commercial Code as applied in Virginia. Hence, the opinion first will discuss briefly the applicable statutes and then will consider the decisional law applicable to the undisputed facts. Because the focus of the appeals, and the pertinent decisional law, has been largely on the financing of negative equity, the opinion will assess the application of the statutory provisions to the negative equity issue. Thereafter, the financing of the gap and other insurance

-6-

contracts, extended warranty and service contracts, and fees at issue in the cases on appeal will be addressed.

## A.   The Applicable Sections of the Bankruptcy Code

The status of a security interest in bankruptcy is determined under 11 U.S.C. § 506(a)(1), which provides that:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest...is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property...and is an unsecured claim to the extent that the value of such creditor's interest...is less than the amount of such allowed claim.

See 11 U.S.C. § 506(a)(1) (2005). However, pursuant to the so-called "hanging paragraph" that follows 11 U.S.C. § 1325(a)(9) (the statutory section that generally determines the status of a secured claim), the provisions of § 506, shall not apply to a claim:

> if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle...acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

See 11 U.S.C. § 1325 (2007) (emphasis added) (this provision has come to be known as the "hanging paragraph" and that term will be used here as well).

In these consolidated appeals, it is undisputed that:

-7-

(1) each debt at issue was incurred within 910 days
preceding the filing of the Chapter 13 petitions; and (2)
the collateral at issue in each case is a motor vehicle that
was purchased for personal use.   Thus, the issue on appeal
is whether the creditors have a purchase money security
interest securing the debt, which includes the financing of
negative equity (as well as the financing of gap insurance,
extended warranty or service contracts, title fees and
taxes).

Because the Bankruptcy Code does not define the term
"purchase money security interest," it is necessary to
interpret the term by reference to the statutory text in
light of the contracts at issue and by reference to pre-
existing statutes which allow an insight into the
Congressional intent of 11 U.S.C. § 1325.   The parties agree
that state law controls what constitutes a purchase money
security interest, and the decisional law clearly supports
that position.

## B.   The Applicable Provisions of Virginia Law

The Virginia Commercial Code provides that: "[a]
security interest in goods is a purchase money security
interest: (1) to the extent that the goods are purchase-
money collateral with respect to that security interest..."
See VA. CODE ANN. § 8.9A-103(b)(1) (2007) (emphasis added).

-8-

Purchase-money collateral means "goods or software that secures a purchase money obligation incurred with respect to that collateral." Id. at § 103(a)(1) (emphasis added). A purchase money obligation is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Id. at § 103(a)(2) (emphasis added).

There is considerable dispute respecting whether negative equity is, or can be, part of the "price of the collateral" (hereinafter sometimes referred to as "price"). Likewise, there is dispute respecting negative equity can constitute "value given to enable the debtor to acquire rights in or the use of collateral...." (hereinafter sometimes referred to as "value given to enable").

## C. The Two Divergent Lines of Authority in Factually Similar Cases

In Pajot, the Bankruptcy Court held that the negative equity was part of the price or of the value given to enable. The Bankruptcy Court reasoned that negative equity was not part of the price of the new vehicle because Comment 3 to the Virginia Code § 8.9A-103(a)(2) did not contemplate the inclusion of negative equity in price and because it was not possible to afford in pari materia reading to the UCC

-9-

section on price with the Virginia Retail Installment Sales Act or with the Federal Truth in Lending Act because neither of those statutes were enacted for the purpose of defining, or clarifying, the meaning of purchase money obligations. Pajot, 371 B.R. at 149-151.   Further, the Bankruptcy Court reasoned that negative equity is not value given or used to enable the debtor to acquire rights in the collateral because a negative equity payoff obligation is not necessary to the transaction and "there is an insufficiently close nexus between the negative equity payoff and acquiring the new vehicle."   Id. at 151-152.[2]

In   LaVigne,   the   Bankruptcy   Court   held   that   the creditors do not have a purchase money security interest in negative equity because it is antecedent debt, and the re-financing of antecedent debt through a trade-in does not create a purchase money security interest.   LaVigne, 2007 WL 3469454,   at   *8.[3]    The   thoughtful   opinions   in   Pajot   and LaVigne represent, quite ably, one line of the developing

---

[2] As to gap insurance, the Court concluded that the parties to the case did not provide any authority to support the argument that the creditor should have a security interest in gap insurance.   Id. at 155.   This issue is discussed in Section E, infra.

[3] With respect to service contracts and insurance policies, the court reasoned that creditors do not have purchase money security interests in these components of the financing because they are neither mandatory components of the loan agreement, nor are they value-enhancing add-ons.   Id. at 12.

-10-

authority on this issue.[4]   An emerging majority of decisions take the opposite view.[5]   Some decisions treat different components (e.g., negative equity and gap insurance) differently.[6]

---

[4]   In re Price, 363 B.R. 734 (Bankr. E.D.N.C. 2007) ("[N]either the money advanced to pay the cost of gap insurance nor the amount advanced to fund the negative equity related to the vehicle that was traded-in come within the definition of "purchase money obligation," and thus cannot give rise to a purchase money security interest."); In re Westfall, 365 B.R. 755 (Bankr. N.D. Ohio 2007) (holding that the financing of negative equity does not result in a purchase money security interest).

[5] GMAC v. Peaslee, 373 B.R. 252, 262 (W.D.N.Y. 2007) (holding that the "portion of claims attributable to the payoff of negative equity on debtors' trade-in vehicles should be treated as secured claims."); In re Schwalm, No. 8:07-bk-4483-KRM, 2008 WL 162933 (Bankr. M.D. Fla. Jan. 16, 2008) (holding that a package transaction, which included the financing of negative equity, extended warranty coverage, and gap insurance, was considered a purchase money obligation in its entirety); In re Burt, 378 B.R. 352 (Bankr. D. Utah 2007) (holding that the entire amount financed by the creditor, including negative equity and a service contract, qualified as a purchase money security interest); Graupner v. Nuvell Credit Corp., No. 4:07-CV-37CDL, 2007 WL 1858291, at *2 (M.D. Ga. June 26, 2007) ("This close nexus between the negative equity and this package transaction supports the conclusion that the negative equity must be considered as part of the price of the collateral.")

[6] In re Munzberg, No. 07-10560, 2008 WL 2332267 (D. Vt. June 3, 2008) (holding that the creditor did not have a purchase money security interest in negative equity or in the gap insurance contract but did retain a purchase money security interest as to the service contract); In re Riach, No. 07-61645-aer13, 2008 WL 474384 (Bankr. D. Or. Feb. 19, 2008) (finding that service contracts and lifetime oil contracts are purchase money obligations, while the financing of negative equity is not a purchase money obligation).

D.   **Whether Negative Equity Constitutes "Price" or "Value Given to Enable"**

1.   **The Statutory Text**

Because the application of the hanging paragraph turns on state law, the starting point for the analysis is the text of Va. Code Ann. § 8.9-103(A) which is to be given its generally accepted, plain meaning unless the statute or interpretive decisions dictate otherwise.   See   Loudoun County Dept. of Social Servs. v. Etzold, 425 S.E.2d 800, 802 (Va. 1993) ("A primary rule of statutory construction is that courts must look first to the language of the statute. If a statute is clear and unambiguous, a court will give the statute its plain meaning.")

The term "price" is defined as: "The amount of money or other consideration asked for or given in exchange for something else." Black's Law Dictionary (8th ed. 2004); see also Webster's Third New Int'l Dictionary (2002) ("[T]he amount of money given or set as the amount of money to be given as a consideration for the sale of a specified thing.")   The term "value" in a commercial context means "the monetary worth or price of something" or "the amount of goods, services, or money that something will command in an exchange." Black's Law Dictionary (8th ed. 2004); see also Webster's Third New Int'l Dictionary (2002) ("the monetary

-12-

worth of something".)    The term "enable" means "to give
power to do something; to make able."    Black's Law
Dictionary (8th ed. 2004); see also Webster's Third New
Int'l Dictionary (2002) ("[T]o give make possible, practical
or easy.")

Applying the usual meaning of the word, the price of a
vehicle pledged as collateral is the sum or amount of money
for which the vehicle is bought.    It is, in other words,
what the buyer paid to get rights in, or the use of, the
vehicle.    Applying the accepted meaning of the term, the
price that the debtors paid for the vehicles at issue
includes negative equity because each debtor, as buyers,
gave to each seller a trade-in vehicle which would not have,
indeed could not have, been accepted for that purpose unless
the balance owed on it by the buyer to the third party had
been paid off.    Thus, the discharge of the buyer's remaining
obligation on the trade-in vehicle was part and parcel of
the buyer's ability to use the trade-in vehicle to buy the
new vehicles.

Given its generally accepted meaning, the term,
"value," in a commercial setting means the worth of
something given in the retail sales transaction.    The
statute modifies the term by specifying that the value be
given for an express purpose -- to enable the buyer to

-13-

acquire the collateral, or, in these cases, to make it possible or easy for the debtor to acquire rights in, or the use of, the vehicle, or to give the debtor the means or ability to acquire rights in, or the use of, the vehicle. Under the facts of these cases, the buyers gave something of value -- the trade-in vehicle -- as a part of what they paid for the new vehicle. However, the buyers could not have contributed the trade-in vehicle unless the seller also acted to enable the debtor to do so, and the financing of the negative equity was just part of the way that the debtor was enabled to use the trade-in vehicle to acquire a possessory right in, and the use of, the new vehicle. Thus, considering the commercial transaction in context of the plain meaning of the statutory terms, the financing of negative equity would be "value given to enable the debtor to acquire rights in, or the use of, the new vehicle, i.e., the collateral.

### 2.   Official Comment

The official comments to the UCC are helpful guides to interpretation of the statutory text.   Official Comment 3 to § 8.9A-103 provides that:

> the "price" of collateral or the "value given to enable" the debtor to purchase the collateral includes: obligations for expenses incurred in connection with acquiring rights in the collateral, sales

> taxes, duties, finance charges, interest,
> freight charges, costs of storage in
> transit, demurrage, administrative charges,
> expenses of collection and enforcement,
> attorney's fees, and other similar
> obligations.

According to the Official Comment, "obligations for expenses incurred in connection with acquiring rights in the collateral" are included within the meaning of the terms "price" and "value given to enable." In so explaining those terms, the Official Comment underscores the statutory meaning of both "price" and "value given to enable" so as to bring negative equity within the reach of the Official Comment and the statute.

### 3. Decisional Law

This view is supported by a considerable number of decisions as well. The two most cited authorities in support of this view are GMAC v. Peaslee, 373 B.R. 252, 252 (W.D.N.Y. 2007) and Graupner v. Nuvell Credit Corp., No. 4:07CV-37CDL, 2007 WL 1858291 (M.D. Ga. June 26, 2007). In Peaslee, the district court considered the creditors' appeal of a bankruptcy court opinion which, in a case factually similar to these cases, held that the creditors' claims were secured only to the extent of the retail price of the new vehicle. Peaslee, 373 B.R. at 255. For that reason, the bankruptcy court bifurcated the creditors'

claim, holding that it was unsecured to the extent that the creditor financed negative equity on trade-in vehicles as part of the transaction.   Id.   The district court reversed the bankruptcy court and held that the creditors had a purchase money security interest, notwithstanding that they had financed negative equity in connection with the debtors' purchase of the new vehicle.   Id. at 262.

When discussing Comment 3 to § 9-103, the district court in Peaslee noted that, as written, the section refers to "price" and "value given to enable" without giving an inclusive list of the items that are to considered as falling within those terms.   Id. at 258-259.   Rather, the comment lists several components of price, one of which is an obligation for expenses incurred in connection with acquiring the rights in, or the use of, the collateral.   Id. at 258.   The district court observed that: "If the buyer and seller agree to include the payoff of the outstanding balance on the trade-in as an integral part of their transaction for the sale of the new vehicle, it is in fact difficult to see how that could *not* be viewed as such an expense."   Id. at 259.

The district court also found support in Official Comment 3 which provides that:

> [t]he concept of 'purchase-money security
> interest' requires a close nexus between the
> acquisition of collateral and the secured
> obligation. Thus, a security interest does not
> qualify as a purchase-money security interest
> if a debtor acquires property on unsecured
> credit and subsequently creates the interest to
> secure the purchase price.

(emphasis added). In Peaslee, the court relied on the

reasoning of Graupner v. Nuvell Credit Corp., which also is

factually similar to the cases on appeal, in holding that:

"Where the parties to the transaction agree to a package

transaction in which the negative equity is inextricably

intertwined with the sales transaction and the financing of

the purchase, one could certainly conclude that this close

nexus between the negative equity and this package

transaction supports the conclusion that the negative equity

must be considered as part of the price of the collateral."

Peaslee, 373 B.R. at 259 quoting Graupner v. Nuvell Credit

Corp., No. 4:07CV-37CDL, 2007 WL 1858291 *2 (M.D. Ga. June

26, 2007) (internal quotations omitted).[7]

---

[7] Other courts have reached the same conclusion for the same
reasons. See In re Cohrs, 373 B.R. 107, 109-110 (Bankr.
E.D. Cal. 2007) ("When a car buyer offers to trade in a
vehicle as part of the purchase price for another vehicle,
the charges incidental to transferring the trade-in vehicle
are part of the purchase price of the new vehicle," and that
"[t]hose charges are incurred to 'enable the debtor to
acquire rights in' the new vehicle."); In re Petrocci, 370
B.R. 489, 499 (Bankr. N.D.N.Y. 2007) (reasoning that "the
financing of negative equity does in fact constitute value
given to enable the debtor to acquire rights in the

The debtors argue that a close nexus cannot exist unless the negative equity financing is a mandatory component of the transaction which creates the security interest. This argument was considered and rejected in Peaslee, wherein the district court concluded that: "The fact that negative equity and trade-ins do not *have* to be included in a sale, and that the buyer could, in theory at least, pay off the negative equity by other means, does not require a contrary result, if the facts surrounding the particular transaction at issue are such that the negative equity was integral to the sale." Peaslee, 373 B.R. at 259 (emphasis added).

In the cases on appeal, the record does not disclose explicitly whether the trade-in and the consequent negative equity financing were mandatory. However, the record does establish that the trade-in and the negative equity financing were an integral part of the transaction, and the Retail Installment Sales Contracts all show the role of the trade-in and the negative equity financing in the transaction. And, no party suggests that they were not an essential part of the contractual arrangements entered into

---

collateral. This negative equity financing is inextricably linked to the financing of the new car. It is clear that one would not take place without the other.") (internal quotations omitted).

between the debtors and the sellers here.    Thus, on this
record, the close nexus required by Official Comment 3 is
rather clearly shown.[8]

The   emerging   majority   of   authority   on   this   issue
follows Graupner and Peaslee in finding that the creditors'
claims   are   not   susceptible   to   bifurcation   because   of   the
inclusion   of   negative   equity   in   the   financing   package.[9]

---

[8] The debtors' argument is further undercut by the fact that
many of the items listed on part of the price or value given
to enable are neither a mandatory, or even usual, component
of a retail sales contract or the financing thereof (e.g.,
demurrage, freight charges, costs of storage in transit,
administrative charges).

[9] See In re Dunlap, 383 B.R. 113, 118 (Bankr. E.D. Wisc.
2008)  ("[T]he  debtor  and  Nissan  entered  into  a  single
transaction  for  the  purchase  and  sale  of  a  new  car,
utilizing  negative  equity  financing  as  the  method  to
accomplish this goal....There is a close nexus in this case
between the acquisition by the debtors of the new car and
the entire secured obligation, including the negative equity
portion."); In re Schwalm, 380 B.R. 630, 634-35 (Bankr. M.D.
Fla. 2008) (adopting the reasoning of GMAC v. Peaslee in
holding that a financing transaction for the purchase of a
new motor vehicle, which included the financing of negative
equity on a trade-in vehicle and gap insurance, qualified as
a purchase money security interest in its entirety); In re
Burt, 378 B.R. 352, 363 (Bankr. D. Utah 2007) (holding that
the creditor had a purchase money security interest in the
entire  transaction  at  issue,  despite  the  fact  that  the
creditor  financed  negative  equity  in  the  trade-in  of  a
vehicle in addition to the retail price of the new motor
vehicle, due to the fact that there was a close connection
between the negative equity and the financing of the new
vehicle, such that the financing transaction was essentially
a package deal); In re Murray, 346 B.R. 237, 240 (Bankr.
M.D. Ga. 2006) (holding that creditor retained a purchase
money  security  interest,  despite  the  inclusion  of  an
extended service contract in the financing transaction).

However, there is also an opposing line of authority, the most persuasive and best-reasoned of which are the decisions of the Bankruptcy Courts in Pajot and LaVigne which are the subjects of these appeals.    Those decisions reach the conclusion that the creditors' claims can be bifurcated because the financing of the negative equity is not value given to enable the debtors to acquire rights in or use of the collateral, rather it is just a method of re-financing pre-existing debt.[10]    Both LaVigne and Pajot held that negative equity is merely antecedent debt.  Both decisions also held that the re-financing of antecedent debt by rolling it into a new loan effectively eliminates the antecedent debt, but does not create a purchase money

---

[10] See generally In re Acaya, 369 B.R. 564 (Bankr. N.D. Cal. 2007) (Amount used to pay negative equity does not constitute part of the price of the collateral or value given to acquire rights in the collateral); In re Blakeslee, 377 B.R. 724, 729 (Bankr. M.D. Fla. 2007) ("The Court also finds that negative equity is not used to enable a debtor to acquire rights in the collateral. Even if a creditor is unwilling to loan money on the purchase of a new vehicle without the payoff of an existing loan, the payoff of negative equity by the creditor is not a prerequisite to enable the debtor to obtain a legal interest in the vehicle's payoff, but merely an accommodation to facilitate the transaction."); In re Price, 363 B.R. 734, 741 (Bankr. E.D.N.C. 2007) ("Providing a loan to refinance negative equity on a trade-in, which may be a convenient but unnecessary option for a consumer purchasing a replacement vehicle, is not value given to "enable" that consumer to acquire rights in or the use of the replacement collateral.")

obligation.   LaVigne, 2007 WL 3469454, at *6 ("refinancing negative equity by rolling it into a new purchase money loan does not thereby create a purchase money obligation at least to the extent of the antecedent debt that was refinanced"); Pajot, 371 B.R. at 152.   The decisions in Pajot and LaVigne both reject the notion that negative equity is a component either of "price" or of "value given to enable."

### a.   Negative Equity as Part of the "Price"

In rejecting the assertion that negative equity is a component of price of the collateral, the decisions in Pajot and LaVigne reasoned that resort could not be had to either the Virginia Retail Installment Sales Act ("RISA") or the Federal Truth In Lending Act ("TILA") to ascertain the meaning of the undefined term in § 8.9-103(A).   Both decisions took the view that the statutes may not be read in pari materia because the purposes of RISA and TILA are different than the purpose of UCC § 8.9-103(A).

However, the conclusions that:(i) the statutes serve different purposes; and (ii) that neither RISA nor TILA use the term "purchase money security interest" do not compel the conclusion that § 8.9-103(A), RISA and TILA may not be read in pari materia.   As explained in Peaslee, it is necessary to determine whether all of the statutes relate to the same subject or cognate subject matter in order to

determine the application of the in pari materia doctrine.
Peaslee, 373 B.R. at 260.   The UCC, § 9-103, RISA and TILA
are "related" to the 'price' of a vehicle in a retail
installment contract.   Thus, they relate to the same subject
matter.

Under Virginia law, "statutes which are not
inconsistent with one another, and which relate to the same
subject matter, are in pari materia, and should be construed
together; and effect should be given to them all, although
they contain no reference to one another, and were passed at
different times."   Ipseen v. Morley, 642 S.E.2d 798, 801
(Va. Ct. App. 2007) (quoting Prillaman v. Commonwealth, 199
Va. 401, 406 (1957)).

RISA focuses on allowable finance charges, while
Article 9 of the UCC focuses on the attachment and
perfection of security interests granted by the debtor under
a purchase money security agreement.   However, both statutes
can be read to relate to the core aspects of the subject of
financing of motor vehicle purchases; and therefore, they
may be read in pari materia.

With respect to purchase money obligations, Article 9
of the UCC requires a close nexus between the secured debt
and the purchase of the collateral.   Similarly, RISA states
that: "The balance on which such finance charge may be

imposed may include the deferred portion of the sales price, costs and charges incidental to the transaction including any insurance premium financed in connection therewith, and the amount actually paid or to be paid by the seller to discharge a security interest or lien on the property traded in." VA. CODE ANN. § 6.1-330.77 (2008). A reading of both the UCC and § 6.1-330.77 of RISA suggests that negative equity financing that is integral to the sales transaction may be viewed as part of the price in the sales transaction, and thus as part of creditor's purchase money security interest.

TILA, 15 U.S.C. § 1601 et seq. (2008) was enacted to support the disclosure of credit terms offered to consumers. See 15 U.S.C. § 1601(a)(2008) ("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.") Under TILA, the "total sales price" is defined as "the sum of the cash price, the items described in paragraph (b)(2) [the amount financed which is calculated by determining the principal loan amount or the cash price, adding any other amounts that are financed by the creditor

-23-

and are not part of the finance charge, and subtracting any prepaid finance charge], and the finance charge...." See 12 C.F.R. § 226.18(j) (2008). A reading of both the UCC and § 226.18(j), which interprets the TILA, suggests that negative equity financing may be viewed as a component of the price of the sales transaction, and thus as part of creditor's purchase money security interest.

Construction of all three statutes together leads to the conclusion that the term "price" includes negative equity. That conclusion is supported by the decisions in Peaslee, 373 B.R at 261 and Graupner, 2007 WL 1858291, at *2, which have reached the same result. The reasoning of those decisions is more in keeping with Virginia law than the interpretation of the in pari materia doctrine given in the Pajot and LaVigne decisions on appeal here. This reading of these statutes, all of which relate quite closely to the subject of "price" in the commercial context of retail sales is fully consistent with the plain meaning of the statutory text of the UCC and Official Comment 3.

        **b.   Negative Equity as to "Value Given to Enable"**

In Pajot, the Bankruptcy Court concluded that negative equity did not constitute "value given to enable" because negative equity was not mandatory and was not a value enhancing add-on and thus was "different from the list of

-24-

expenses included in Comment 3." Pajot, 371 B.R. at 152. In LaVigne, the Bankruptcy Court likewise held that negative equity was not an expense because it was not essential to the acquisition of the new motor vehicle. 2007 WL 3469454, at *8. And, as in Pajot, the decision in LaVigne did not find negative equity to be an "expense" within the meaning of Comment 3 because it was not like the other expenses, such as titling fees, listed in Comment 3. Id.

As explained previously, it does not appear that either the text of § 8.9-103 or Comment 3 requires that value given to enable be a mandatory component of the purchase price so long as there is a close nexus between the secured debt and the collateral. For the reasons explained above, the contracts at issue here establish the existence of a close nexus between the secured debt and the collateral.

Both Pajot and LaVigne also express the view that negative equity is not like the other "expenses" listed in Official Comment. The text of Comment 3 explains that both "price" and "value given to enable" include "obligations for expenses incurred in connection with acquiring rights in the collateral." The comment also includes: "sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit demurrage, administrative charges, attorney's fees, and other similar obligations."

Contrary to the apparent interpretation given in the Bankruptcy Court decisions, the list in Comment 3, the first item of which is "obligations for expenses incurred in connection with acquiring rights in the collateral," does not contain the words "such as" or "like," and thus the items are best understood as additional items which can be components of "price" or "value given to enable," not examples of such components. Peaslee, 373 B.R. at 258. The phrase "obligation for expenses incurred in connection with acquiring rights in the collateral" is just one of the several listed items and, when that phrase is given its plain meaning, the obligation to pay the negative equity expense that was paid by the seller is an expense incurred in connection with acquiring rights in the new car, and the debtors' obligation in respect of that expense falls within the meaning of "value given to enable" as used in § 8.9-103.

The Retail Installment Sales Contracts executed individually by Horne, Taylor, and LaVigne include a section regarding security interests which states:

> "You [the debtor] give us [the creditor] a security interest in: (1) The vehicle and all parts or goods put on it; (2) All money or goods received (proceeds) for the vehicle; (3) All insurance, maintenance, service, or other contracts we finance for you; and (4) All proceeds from insurance, maintenance, service, or other

-26-

> contracts we finance for you. This
> includes any refunds of premiums or
> charges from the contracts."

See Retail Installment Sale Contracts at § 2(c). The
parties agreed that the creditor had a security interest in
all insurance, maintenance, service, or other contracts for
which financing was provided. See Retail Installment Sales
Contract at § 2(c)(3). Thus, negative equity, which was
included in financing the vehicle, can be viewed as an
expense in connection with acquiring the rights to the
vehicle, particularly since the parties were in agreement on
that point. See generally Orix Credit Alliance, Inc. v.
Nationsbank of Virginia, N.A., No. 93-1193, 1993 WL 492907
*4 (4th Cir. Nov. 30, 1993) (the extent of a security
interest is determined by looking at the totality of the
language in a document to determine whether the parties
intended to create a security interest); In re Carpenter,
252 B.R. 905, 911 (E.D. Va. 2000) (an equitable lien may be
imposed on a specific property when there is was an express
or implied agreement demonstrating clear intent to create a
security interest); In re Southern Properties, Inc., 44 B.R.
838, 843 (Bankr. E.D. Va. 1984) (when considering whether a
secured creditor retained a security interest in equipment
after the sale of the equipment, the Court considered the

parties' intent regarding the continuation of the security interest).

On the records presented here, the reasoning of Peaslee and Graupner is more persuasive because the parties agreed to a package transaction, and the negative equity obligation was inextricably linked with the sales transaction. The Retail Installment Sales Contracts here at issue reflect the parties' intent to undertake a contractual transaction as to which the negative equity is inextricably entwined.

### 4. The Purpose of the "Hanging Paragraph and the Policy Underlying the UCC

The emerging majority interpretation of purchase money security interest to encompass negative equity is further supported by an examination of the purpose of the hanging paragraph. In deciding similar cases, courts have considered the Congressional intent of the hanging paragraph. In Pajot, which is on appeal here, the court reasoned that "In enacting the hanging paragraph, Congress [sought] to ensure that debtors could not load up on vehicle-secured debt pre-petition only to cram it down to the collateral value in bankruptcy." In re Pajot, 371 B.R. 158-59 (Bankr. E.D. Va. 2007). Similarly, the court in Peaslee reasoned that "The 'hanging paragraph' itself...clearly indicate[s] the intent was to protect

creditors from perceived abuses by spendthrift debtors prior to petitioning for Chapter 13 relief....[T]he so-called 'hanging paragraph' of § 1325, was obviously intended to protect the interests of automobile dealers who provide financing for customers." 373 B.R. at 261. The interpretation reflected in Graupner and Peaslee, and the emerging majority, best effectuates the expressed Congressional intent.

Finally, this interpretation of § 8.9-103 finds support in the fundamental policies underlying enactment of the UCC. Specifically, § 8.1-102(2) articulates that the statute seeks to promote "the continued expansion of commercial practices through custom, usage and agreement of the parties. The practices here are common in the automobile sales industry, Peaslee, 373 B.R. at 259, and the parties made clear what their agreement was and, in so doing, they specified the debt to which the purchase money security entered was to attach. The fundamental purposes of the UCC and the Congressional intent in enacting BAPCPA are best served by construing § 8.9-103 in accord with the decisions in Peaslee, Graupner and the emerging trend to adopt their rationale.

For the foregoing reasons, the Court finds that negative equity may be considered as a component of the

-29-

"price" and of the "value given to enable," and, consequently, that the creditors maintain purchase money security interests in the negative equity financing.

**E.   Gap and Other Insurance, Extended Warranties and Service Contracts and Fees as Components of "Price" or "Value Given to Enable"**

In addition to negative equity, which has been addressed above, the Retail Installment Sales Contracts at issue also provided financing for one or more of the following: gap insurance, disability insurance, warranties, extended service contracts, and official fees. The Bankruptcy Court in Pajot, held that gap insurance coverage financed by the creditor was not part of the purchase money debt, but that the creditor did maintain a security interest in the extended warranty coverage that was financed. Pajot at 155. In contrast, in LaVigne, the Bankruptcy Court held that creditors do not have purchase money security interests in extended service contracts or in any insurance policies, including disability, single interest, and gap insurance policies. LaVigne, 2007 WL 3465454, at *12.

Neither gap insurance nor disability insurance can be fit within the plain, accepted meaning of the price paid for (or asked for) the collateral. Nor does Official Comment 3 support such a construction. However, both are obligations for expenses that, in a general way, were incurred in

-30-

connection with acquiring rights in the collateral.    And, both are part of the overall transaction by which the vehicle was purchased.    However, neither is inextricably intertwined with the "value given to enable" in the same way that negative equity financing is intertwined.    Indeed, nothing in the record suggests that those obligations enabled the debtor to acquire rights in, or the use of, the collateral.    Instead, those obligations are attached to components of the sale price that are quite unrelated to the acquisition of the collateral.    Therefore, the obligations for such expenses do not possess the requisite close nexus with the collateral and thus cannot qualify as value given to enable.

In like fashion, the extended warranties and service contracts are neither part of the price of the collateral or the value given to enable the debtor to acquire rights in, or the use of, the collateral.    In fact, there was a standard warranty that came along as part of the retail price.    The extended warranties and service contracts are unrelated, incidental obligations, and like the insurance obligations,   they   do   not   fulfill   the   close   nexus requirement.

Several decisions have reached contrary results,[11] but the rationale of those decisions focuses on the "package" aspect of the transaction. In so doing, those decisions depart from the plain meaning of the statutory text and the guidance of the Official Comment and use the packaged nature of the transaction to sweep in every obligation that appears in the Total Sales Price. The "package" analysis is helpful in analyzing the close nexus requirement, but it is not a substitute for examining each obligation in light of the statutory text and the Official Comment. When measured against those yardsticks, insurance, extended warranties, and service contracts do not fall within the purchase money security interest, notwithstanding that they are part of the

---

[11] See In re Jernigan, No. 07-04037-8-JRL, 2008 WL 922346 *2 (Bankr. E.D.N.C. 2008) (holding that extended service contracts were included as part of the purchase money price because "such charges are so tied to the value of the collateral that they fall within the meaning of the purchase money obligation...."); In re Macon, 376 B.R. 778, 782 (Bankr. D.S.C. 2007) ("The Debtor purchased this vehicle, paid certain necessary fees and costs, and elected additional items [service contracts and gap protections] as part of the transaction to protect and maintain the vehicle. The additional charges added value for the Debtor to the consideration received and have no value whatsoever unless incorporated into the purchase of this [v]ehicle."); In re Murray, 352 B.R. 340, 349 (Bankr. M.D. Ga. 2006) (holding that the creditor did retain a purchase money security interest in the vehicle despite the inclusion of a service contract, a documentary fee, and a certificate of title fee in the sales contract due to "the nature of the additional items purchased and the relationship between those items and the collateral, which were purchased at the same time and in the same transaction as the collateral....")

packaged transaction.

Finally, Official Comment 3 makes clear that official licensing, titling and registration fees and the like are qualified for purchase money security interest status.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's decisions respecting the security interests held by GMAC and CitiFinancial are affirmed in part and reversed in part, and the cases are remanded for further proceedings consistent with this opinion.

It is so ORDERED.

_____/s/_____  *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 3, 2008